UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Christyna Faulkner, M.D.,
 Plaintiff

 v.            Case No. 12-cv-482-SM
                Opinion No. 2015 DNH 157

Dartmouth Hitchcock Medical Center;
Jocelyn D. Chertoff, M.D.; Anne M. Silas, M.D.;
Peter K. Spiegel, M.D.; Marc L. Bertrand, M.D.;
and Mary Hitchcock Memorial Hospital,
 Defendants

# O R D E R

Christyna Faulkner brings this action against her former employer and others, advancing claims under both the Americans with Disabilities Act and the Family Medical Leave Act. She also brings state law claims of wrongful discharge, intentional infliction of emotional distress, and defamation. Although she was initially represented by counsel, Faulkner is now proceeding pro se.[1]

---

[1] As the court noted in a prior order, this case was filed in 2012, and discovery soon stalled. Part of the substantial delay in resolving this case occurred when Faulkner's counsel withdrew and she sought, but was unable to secure, alternate representation. And, no doubt, Faulkner's unfamiliarity with the federal rules governing discovery, including her obligations under those rules, contributed to the ongoing delay. Indeed, Faulkner's alleged failure to comply with an earlier discovery order of the court eventually prompted defendants (who have been commendably patient and accommodating) to file a motion to dismiss under Rule 41(b) of the Federal Rules of Civil Procedure.

Currently before the court is defendants' motion for summary judgment as to all counts advanced in Faulkner's second amended complaint.  For the reasons discussed, that motion is granted.

## Standard of Review

When ruling on a motion for summary judgment, the court must "constru[e] the record in the light most favorable to the non-moving party and resolv[e] all reasonable inferences in that party's favor."  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).  See also Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011).  But, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

2

The key, then, to defeating a properly supported motion for
summary judgment is the non-movant's ability to support her
claims concerning disputed material facts with admissible
evidence that conflicts with that proffered by the moving party.
See generally Fed. R. Civ. P. 56(c).  It naturally follows that
while a reviewing court must take into account all properly
documented facts, it may ignore a party's bald assertions,
unsupported conclusions, and mere speculation, see Serapion v.
Martinez, 119 F.3d 982, 987 (1st Cir. 1997), as well as those
allegations "which have since been conclusively contradicted by
[the non-moving party's] concessions or otherwise," Chongris v.
Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987).  See also
Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties
tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could
believe it, a court should not adopt that version of the facts
for purposes of ruling on a motion for summary judgment.").


Faulkner's objection to defendants' motion for summary
judgment was originally due in mid-March.  Subsequently, however,
the court granted her motion seeking additional time to file her
objection.  By order dated May 6, 2015, the court directed that
Faulkner "shall file a response to the pending motion for summary
judgment on or before July 31, 2015" - more than four months

3

after its original due date.  Document no. 63 (emphasis in
original).  Faulkner did not comply with that order and failed to
file a timely objection.  Nor has she sought additional time to
file an objection.  Accordingly, the court necessarily takes as
admitted the factual statements recited in defendants' motion, as
supported by the attached exhibits.  See Local Rule 56.1(b)
(formerly, Local Rule 7.2(b)(2)) ("All properly supported
material facts set forth in the moving party's factual statement
may be deemed admitted unless properly opposed by the adverse
party.").  See also Puerto Rico American Ins. Co. v. Rivera-
Vazquez, 603 F.3d 125, 131 (1st Cir. 2010) (discussing Puerto
Rico's analog to Local Rule 56.1(b), also known as the "anti-
ferret rule," and holding that, "This type of rule is aimed at
enabling a district court to adjudicate a summary judgment motion
without endless rummaging through a plethoric record.  Given this
root purpose, we have held with a regularity bordering on the
monotonous that parties ignore the strictures of an 'anti-ferret'
rule at their peril.") (citations omitted).

        Of course Faulkner's failure to object does not
automatically entitle defendants to judgment as a matter of law.
The court must still determine whether the uncontested facts
presented by defendants, when viewed in the light most favorable
to Faulkner, warrant entry of summary judgment in favor of

defendants.  <u>See, e.g.</u>, <u>Stonkus v. City of Brockton Sch. Dep't</u>,
322 F.3d 97, 102 (1st Cir. 2003).


## Background

The relevant factual background to this case is largely
undisputed.  In May of 2008, Faulkner signed a written employment
agreement with Mary Hitchcock Memorial Hospital ("MHMH") and, in
July, she began the first year of a medical residency program in
diagnostic radiology.  Early in 2009, she revealed to some of the
attending physicians, and the director of the residency program,
that she suffered from insomnia and was sleeping for only a few
hours each night.  Faulkner obtained medical treatment for
insomnia and, in March of 2009, her treating physician (Dr.
Sateia) contacted the residency program director (Dr. Chertoff)
to request a schedule modification as an accommodation.  Dr.
Chertoff provided that accommodation.  <u>See</u> Email from Dr.
Chertoff to Dr. Sateia, dated March 4, 2009 (document no. 56-6)
("I will certainly do anything you think is needed to help her.
. . . I know she is hesitant to ask for any special treatment,
but I keep trying to reassure her that this is no different than
any other medical problem, and we will follow whatever her
providers recommend, no questions asked.").  A few weeks later,
in May of 2009, Dr. Sateia requested a modification to Faulkner's
call schedule, which request was also granted.

Even with those accommodations, however, Faulkner's work performance remained, at best, inconsistent and below expectations.   Still, in June of 2009, she was advanced to the second year of residency, and signed another employment contract with MHMH.   In July, her treating physician again asked that Faulkner's schedule be modified, so she might have more time to study for an examination.   Defendants, Dr. Chertoff and Dr. Silas, granted that request as well.   Later that same year, Faulkner was given yet another accommodation to her schedule and she was afforded additional time to study for her examinations. But, despite the numerous accommodations given to Faulkner, her work performance remained unacceptable.[2]

---

[2]   In her affidavit, Dr. Chertoff testified as follows:

> In addition to providing schedule modifications, I helped to reschedule some of Dr. Faulker's exams on different occasions, allowed for a more flexible vacation schedule on at least one occasion, and authorized an atypical grand rounds topic, to a subject that she was already familiar with.

> Despite accommodations and encouragement, Dr. Faulker's academic performance was poor.   She consistently received negative evaluations for her poor fund of medical knowledge, unacceptable interpretations, and for being unprepared.   She had poor communications skills, and had to be spoken to on several occasions for dressing unprofessionally and wearing a sweatshirt over appropriate hospital attire.

Affidavit of Dr. Jocelyn Chertoff (document no. 56-31), at paras. 9-10.

Nevertheless, MHMH remained committed to assisting Faulkner. Accordingly, Dr. Chertoff wrote to Faulkner's treating physician to see if there was anything else that might be done to help her succeed in the program.

> It seems pretty clear that our plan for your patient, my resident, isn't really working.  She is aware of this, but [she] assumed I would either fire her or put her on probation.  I wouldn't even consider doing either of those things.
>
> Is there a time we can talk about how to manage her, so that hopefully she can still succeed in this program? . . . She just isn't learning this way, and I'm hearing rumbling about whether or not she can "make it."
>
> I look at this as a medical problem, and something that we have to be committed to managing.

E-mail from Dr. Chertoff to Dr. Sateia, dated October 7, 2009 (document no. 56-12).  Subsequently, Dr. Sateia acknowledged the support Faulkner was receiving from the administrators of her program and wrote, "Christyna is fortunate to have such a supportive faculty addressing this."  E-mail from Dr. Sateia, dated October 13, 2009 (document no. 56-13).

On October 14, 2009, Faulkner and Dr. Sateia met with Drs. Chertoff, Silas, and Lewis (Faulkner's advisor), and the residency program coordinator, Willo Sullivan.  The group reviewed (and everyone, including Faulkner, signed) a written plan for Faulkner to follow until she left for a required

7

residency rotation at Boston Children's Hospital.  <u>See</u> Meeting
Summary (document no. 56-14).  As part of that plan, MHMH, in
consultation with Faulker's treating physician, temporarily
suspended her night call obligations.  All agreed that this
accommodation "will require some degree of buy in from the other
residents."  <u>Id.</u>  Accordingly, Faulkner agreed that, while her
fellow residents would "not be given any confidential medical
information, [w]ith Dr. Faulkner's permission, they will be told
that she has significant issues with insomnia, that this is a
medical condition, being managed by physicians at DHMC, and
[that] these recommendations are accommodations, supported by her
physicians, in accordance with the Americans with Disabilities
Act."  <u>Id.</u>

     Additionally, MHMH agreed to contact Boston Children's
Hospital to help implement program accommodations for Faulkner
while she worked there.  Faulker agreed that BCH would be
informed that she cannot take night call, as "an accommodation
necessary for a medical condition."  <u>Id.</u>  Additionally, Faulkner
agreed that:

> There is a strong likelihood that Christyna will need
> additional time (at full pay and benefits) in the
> program, due to medically related time lost.
>
> There is a strong likelihood that Christyna will need
> to delay taking boards.

Christyna will need to spend a significant amount of
time and effort to catch up to her expected level of
knowledge, and to progress.  Particular attention must
be paid to the accuracy of her reports.

Id.  That meeting summary also contains the following notes:

We cannot assess your work properly, until we can
exclude the influence of sleep deprivation;

This is a medical problem at this point and will be
handled in that way;

There are NO PLANS for probation or termination.

Id. (emphasis in original).


    In January of 2010, the program coordinator for the MHMH

residency programs contacted Faulkner to confirm that Faulkner

had given permission to inform her fellow residents of her

medical condition.

Dr. Chertoff is looking for permission . . . to mention
to the residents that you have a sleep problem and that
is why you are not taking overnight call.  I know that
you emailed them last fall and spoke with some of them
personally, but we are going to discuss the Spring call
schedule at the next residents meeting (Feb 2) and she
knows it will come up.  She is not comfortable saying
anything without your OK.

Email from Willo Sullivan to Christyna Faulker dated January 10,

2010 (document no. 56-15).  In response, Faulkner wrote: "I sent

an email to the residents and she [Dr. Chertoff] can tell them

that I have insomnia.  I'm happy she is still willing to work with me."  Id.

From December of 2009 into March of 2010, Faulkner participated in the residency rotation at Boston Children's Hospital.  During that period, MHMH received her evaluations from the fall of 2009.  They revealed that Faulkner had a deficient fund of medical knowledge and poor interpretive skills. Additionally, she was often perceived to be ill-prepared.  See generally "People's Comments Report" (document no. 56-16) (collecting reviews of Faulkner's performance and noting her substantial deficiencies including, for example, "Well below peers in general and neuro-specific knowledge.  Does not understand basic disease processes and pathophysiology").  See also Affidavit of Anne M. Silas, M.D. (Director of Radiology Residency Program) (document no. 56-32) at para. 7 ("Dr. Faulkner's performance was not satisfactory, and was behind that of her peers.  It is my recollection that her test scores were low, her evaluations were poor, and her performance could be unacceptable at times.  For example, in the Spring of 2009, she ranked in the lowest percentile for first year residents in a service exam.  Her 2009 and 2010 evaluations reflected poor performance, and included observations such as needing constant direction, being far behind in her studies, and struggling to

10

grasp fundamental issues."). Because of those deficiencies, Faulkner was not advanced to the third year of residency and she was required to repeat her second year. Importantly, however, Faulkner admitted in her deposition that she had no evidence to suggest that MHMH's failure to promote her was motivated by any discriminatory animus.[3]

In April of 2010, Faulkner met with a physician in Occupational Medicine, to assess her fitness for duty, to review the accommodations that were being provided to her, and to determine "whether additional accommodations would be useful in enhancing her performance and quality of patient care." Report of Dr. Robert McLellan (document no. 56-20). Faulkner was not

---

[3]     As part of its ongoing efforts to accommodate Faulker's medical issues and ensure that she was able to perform up to expectations, MHMH substantially revised her call schedule by eliminating overnight call and by reducing the overall number of hours Faulker was expected to be on call from 321 down to 171. See "Residency Expectations – Chistyna Faulkner (March 2010)" (document no. 56-17). In that same document (which Faulkner signed), MHMH noted:

> It is understood that during the time of [Faulkner's] evaluations, Dr. Faulkner had a medical issue that interfered with her work performance. . . . Although we recognize that her evaluations may not reflect her ability, they do reflect [her] performance during residency. On that basis, the promotions committee has determined that she cannot be promoted to a third year position. Therefore, in order to meet the standards of the residency program, Dr. Faulkner will repeat her second year.

Id. (emphasis supplied).

fully cooperative.  <u>See</u> <u>id.</u> ("She did not consent to discussing
details of her medical situation, accessing her personal medical
record, or communicating with her treating provider.  As such I
am unable to independently evaluate her medically to assess the
impact of a medical condition on her performance or to address
accommodations.").  Nevertheless, Faulkner did authorize Dr.
McLellan to report that, "she felt her current accommodations are
appropriate to optimize her performance from a medical
perspective and that she does not request any additional
accommodations.  She states that the existing accommodations of
'no night call' have been successful in improving her medical
condition."  <u>Id.</u>

     In May of 2010, Faulkner asked for and received two weeks of
vacation.  She then requested and was granted a one-week
extension of that vacation.  Toward the end of that period,
Faulkner requested, and MHMH granted her, twelve weeks of medical
leave under the FMLA.  Then, shortly before she was scheduled to
return to work, Faulkner submitted a note from one of her
treating physicians (Dr. Sateia) that said the "essential problem
which Dr. Faulkner faces is insufficient sleep which is, in turn,
associated with daytime dysfunction which may variably include
diminished alertness and concentration, fatigue, and <u>impairment
in cognitive processing</u> and memory."  Deposition of Christyna

Faulkner (document no. 56-3) at 95 (emphasis supplied).
According to MHMH, that was the first time it realized that
Faulkner's cognitive abilities could be impaired by her medical
condition.  In response, on September 13, 2010, MHMH notified
Faulkner that she could not return to the residency program,
citing its concerns for patient safety.  Faulkner was placed on
paid administrative leave, told that she could resign or be
terminated, and informed of her "fair hearing" options under the
terms of her employment contract.  She declined to participate in
that process and refused to voluntarily resign.

Shortly thereafter, in October of 2010, Faulkner asked Dr.
Chertoff and Dr. Silas to provide letters of reference to a
residency program at Harlem Hospital in New York, which they did.
Faulkner was not offered a position in that program, though she
does not know why.  She admits that she does not have any
evidence to show that her inability to secure a position at
Harlem Hospital was linked to any wrongful act(s) of the
defendants, but she speculates that one or more defendants must
have said something negative (and actionable) about her.  See,
e.g., Deposition of Christyna Faulkner (document no. 56-3) at
109-10.  In her second amended complaint, Faulkner alleges that
those letters (and/or oral comments made by the authors)
contained defamatory statements.  She also alleges that one of

those letters unlawfully disclosed her confidential medical information, in violation of the ADA.

On July 27, 2011, – more than 300 days after her employment was terminated – Faulkner filed a complaint with the Equal Opportunity Employment Commission, alleging that Dartmouth Hitchcock Medical Center ("DHMC") – not her employer –  had discriminated against her on the basis of her race (African American) and disability (insomnia), in violation of Title VII and the ADA.[4]  But, the EEOC noted that the allegedly discriminatory conduct of which Faulkner complained occurred more than 300 days prior to the date on which her charge was filed, so it did not consider those claims.  Only a single charge of discrimination – arising from Faulkner's claim that DHMC unlawfully disclosed her confidential medical information in a letter of reference dated October 27, 2010 – was timely.  See EEOC Final Determination Letter (document no. 56-28).  On September 12, 2012, the EEOC issued Faulkner a "right to sue" letter.  This litigation ensued.

---

[4]     MHMH – Faulkner's former employer – is a non-profit corporation that is a licensed hospital under the laws of New Hampshire.  DHMC is not a hospital and has no employees.  It has never employed Faulkner.  See Affidavit of Kimberly Troland, Interim General Counsel for MHMH, Dartmouth-Hitchcock Clinic, and Dartmouth-Hitchcock Health (document no. 56-35).

14

**Discussion**

I.  <u>Federal Claims</u>.

    A.  <u>ADA Claims and Administrative Exhaustion</u>.

    In count one of her second amended complaint, Faulker
alleges that MHMH and/or DHMC violated the ADA by failing to
consistently and adequately accommodate her disability and by
unlawfully disclosing the existence of her disability to a third
party.  Prior to bringing discrimination or retaliation claims
under the ADA, a plaintiff must exhaust available administrative
remedies.  That is accomplished by filing a timely claim of
discrimination with the EEOC.

> Claims of employment discrimination and retaliation
> under the ADA are subject to the procedural
> requirements of Title VII of the Civil Rights Act of
> 1964.  Under this procedural regime, litigation "is not
> a remedy of first resort" for either discrimination or
> retaliation cases.  Rather, a would-be plaintiff must
> first exhaust his administrative remedies.  This task
> embodies two key components: the timely filing of a
> charge with the EEOC and the receipt of a right-to-sue
> letter from the agency.

<u>Rivera Diaz v. Humana Ins. of Puerto Rico, Inc.</u>, 748 F.3d 387,
389-90 (1st Cir. 2014) (citations and internal punctuation
omitted).  <u>See also</u> <u>Loubriel v. Fondo Del Seguro Del Estado</u>, 694
F.3d 139, 142 (1st Cir. 2012).

    Here, it is undisputed that Faulkner did not file her charge
of discrimination with the EEOC in a timely manner.  She does not

assert (nor has she borne the "heavy burden" to demonstrate) that this is one of those rare cases involving "exceptional circumstances" sufficient to warrant application of equitable tolling or estoppel.  See Farris v. Shinseki, 660 F.3d 557, 563 (1st Cir. 2011) (citing Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 71 (1st Cir. 2005)).  The discrimination claims are untimely.

The sole ADA claim that the EEOC concluded was timely filed relates to Faulkner's assertion that her confidential medical information was unlawfully disclosed in Dr. Chertoff's October 2010 reference letter.  But, while that claim may have been filed with the EEOC within 300 days of the allegedly wrongful act, it was asserted against Dartmouth Hitchcock Medical Center, an entity that never employed Faulkner (and, in fact, has no employees).  As noted above, Faulkner never filed a charge of discrimination with the EEOC against her employer, MHMH, and her claim fails on that ground.

Nevertheless, even assuming that Faulkner may pursue her sole (purportedly) exhausted ADA claim in this action, it fails on the merits.  MHMH did not learn of Faulkner's insomnia through a "medical examination" or "medical inquiry."  See 42 U.S.C.

§ 12112(d).  Instead, Faulkner voluntarily disclosed her medical condition to fellow residents, attending physicians, and the director of the radiology residency program soon after she began working at MHMH.  Later, in October of 2009, she specifically authorized MHMH personnel to reveal her condition to personnel at Boston Children's Hospital.  Then, in January of 2010, she specifically authorized MHMH to reveal her medical condition to her fellow residents (information Faulkner had already shared with those residents).  Consequently, the confidentiality requirements of the ADA were not implicated, nor were they violated, when Dr. Chertoff vaguely referenced Faulkner's "medical issues" in her letter of reference.[5]  See, e.g., EEOC v. Thrivent Financial for Lutherans, 700 F.3d 1044, 1050-52 (7th Cir. 2012) (holding that unless an employee's medical information

---

[5]     The challenged language in Dr. Chertoff's letter of reference is as follows:

> Unfortunately, as time went on it became increasingly clear that our program was not a good fit for Dr. Faulkner.  We are a small to medium sized department and while we have all of the usual and necessary policies in place, we are not, fundamentally, a policy driven department.  Looking back, the lack of clarity about how to proceed in many circumstances was probably not comfortable for her.  I understand, also, that she felt isolated here.  Finally, Dr. Faulkner had medical issues that had a significant impact on her performance, and on her satisfaction with our department, despite what we thought was appropriate accommodation.

Chertoff Letter of Reference (document no. 56-25).

is acquired through a "medical examination" or employer
"inquiry," see 42 U.S.C. § 1112(d), rather than by way of a
voluntarily disclosure by the employee, it is not subject to the
ADA's confidentiality requirements).  See also Pouliot v. Town of
Fairfield, 226 F. Supp. 2d 233, 246 (D. Me. 2002) (holding that
section 12112(d) does not protect medical information voluntarily
disclosed by an employee).  See generally Sheriff v. State Farm
Ins. Co., 2013 WL 4084081, at *8 (W.D. Pa. Aug. 13, 2013)
(collecting cases).

      B.   FMLA Retaliation.

      In count five of her second amended complaint, Faulkner
alleges that MHMH retaliated against her in response to her
invocation of rights under the Family and Medical Leave Act, 29
U.S.C. § 2601.  The framework for analyzing and resolving an FMLA
retaliation claim is well established.

> First, a plaintiff employee must carry the initial
> burden of coming forward with sufficient evidence to
> establish a prima facie case of discrimination or
> retaliation.  To meet this burden, [the plaintiff] must
> show that (1) he availed himself of a protected right
> under the FMLA; (2) he was adversely affected by an
> employment decision; (3) there is a causal connection
> between his protected activity and [the employer's]
> decision to terminate him.  If the plaintiff
> establishes a prima facie case, the burden shifts to
> the employer to articulate some legitimate,
> nondiscriminatory reason for the termination.  If the
> employer can proffer evidence sufficient to raise a
> genuine issue of fact as to whether it discriminated
> against the employee . . . the presumption of

18

> discrimination drops from the case, and the plaintiff
> retains the ultimate burden of showing that the
> employer's stated reason for terminating him was in
> fact a pretext for retaliating against him for having
> taken protected FMLA leave.

Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 69 (1st

Cir. 2015) (citations and internal punctuation omitted).


Here, Faulkner has not established a prima facie case of

discrimination, given the lack of evidence suggesting any causal

connection between her invocation of her right to FMLA leave and

her subsequent termination.  At most, she can point to a temporal

proximity between her planned return to work from FMLA leave and

MHMH's decision to place her on administrative leave.  But, even

assuming she has carried that minimal burden, MHMH has

articulated a serious, legitimate, non-discriminatory reason for

her discharge: its concern for patient safety, given the report

from Faulkner's treating physician stating that she suffers from

"diminished alertness and concentration, fatigue, and impairment

in cognitive processing and memory."  In response, Faulkner has

failed to identify any evidence supportive of her belief that

MHMH's stated reason for her discharge is merely a pretext for

unlawful discrimination.  Here, as in Carrero-Ojeda v. Autoridad

de Energia Electrica, 755 F.3d 711, 720 (1st Cir. 2014), Faulkner

has pointed to "no facts beyond the timing of her discharge -

e.g., no negative comments, complaints, or expressions of

reluctance by her superiors or co-workers about her FMLA leave-
taking, no discussion of her FMLA leave status in performance
reviews, etc. — that would lead us to think that defendants took
her FMLA requests or leave status into account when deciding to
discharge her.").

Given the undisputed evidence of record, defendants are
entitled to judgment as a matter of law on Faulkner's FMLA
retaliation claim.

II.  <u>State Law Claims</u>.

A.  Wrongful Discharge

MHMH asserts that, as a contract employee, Faulkner cannot,
as a matter of law, pursue a claim for wrongful discharge.
Instead, says MHMH, she is limited to a claim for breach of her
employment contract (a claim she does not assert).  While the New
Hampshire Supreme Court has yet to address the issue, this court
(Barbadoro, J.) has suggested that there are circumstances under
which contract employees may pursue tort claims against their
employers for wrongful termination.  <u>See</u>, <u>Attard v. Benoit</u>, 2007
WL 4380065 At *3, 2007 DNH 155 (Dec. 12, 2007).  <u>See generally</u>
<u>Daly v. Univ. of N.H.</u>, 2001 WL 1326585 at *6, 2001 DNH 170
(D.N.H. Sept. 19, 2001) (McAuliffe, J.) (discussing the overlap
between the covenant of good faith and fair dealing implicit in

all contracts and the rights afforded at-will employees by virtue
of the common law action for wrongful termination).

But, even assuming Faulkner can bring a wrongful termination
claim under New Hampshire common law, it fails as a matter of
law.  To prevail on such a claim, Faulkner must demonstrate two
things:

> one, that the employer terminated the employment out of
> bad faith, malice, or retaliation; and two, that the
> employer terminated the employment because the employee
> performed acts which public policy would encourage or
> because he refused to perform acts which public policy
> would condemn.

Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1992) (citing
Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 921-22
(1981)) (emphasis supplied).  Faulkner has demonstrated neither.

Faulkner has not pointed to any record evidence from which a
properly instructed jury could plausibly infer that MHMH or any
of the named defendants acted in bad faith, with malice, or in
retaliation.  In fact, the evidence rather strongly suggests the
contrary.  MHMH promptly and positively responded to Faulkner's
repeated requests for accommodation, and it implemented
significant measures to help Faulkner succeed in her residency
program.

21

Nor has Faulkner alleged that she was discharged because she performed any acts which public policy would encourage, or because she refused to perform any acts which public policy would condemn.  Rather than pointing to conduct in which she engaged (or refused to engage) as a motivating factor behind her termination, Faulkner relies instead on her "status" as an individual with a medical condition.  See, e.g., Second Amended Complaint (document no. 11) at para. 94 ("Plaintiff was terminated from the program as a direct result of her medical condition, and of defendants' unwillingness to accommodate the condition.").  In essence, she asserts that it is against New Hampshire public policy to fire someone who suffers from a disability or physical ailment.  While that may be true, it does not form the basis of a common law claim for wrongful termination which, as noted above, focuses on conduct in which the plaintiff engaged (or refused to engage), and not on age, ethnicity, or physical or mental impairments.

The New Hampshire Supreme Court has made this discrete point quite clearly and has expressly held that the common law cause of action for wrongful termination is not the proper vehicle by which to seek redress for alleged "status-based" discrimination.

> We construe Monge [v. Beebe Rubber Co., 114 N.H. 130
> (1974)] to apply only to a situation where an employee
> is discharged because he performed an act that public

> policy would encourage, <u>or refused to do</u> that which
> public policy would condemn.  A discharge due to
> sickness does not fall within this category, and is
> generally remedied by medical insurance or disability
> provisions in an employment contract.  Nor does
> discharge because of age fall within this narrow
> category.  The proper remedy for an action for unlawful
> age discrimination is provided for by statute.

<u>Howard v. Dorr Woolen Co.</u>, 120 N.H. 295, 297 (1980) (citations omitted) (emphasis supplied).  <u>See also</u> <u>Parker v. MVM, Inc.</u>, 2006 WL 1724359 *2-3, 2006 DNH 70 (D.N.H. 2006) ("[T]he common law cause of action for wrongful discharge is not the proper means by which to remedy a discharge that was motivated by someone's status or physical condition.  Instead, that cause of action is properly invoked only when an employee is discharged in response to his or her having engaged in a 'narrow category' of conduct.") (citation omitted).


   B.   Intentional Infliction of Emotional Distress

   Next, Faulkner asserts claims of intentional infliction of emotional distress against the four individually named defendants.  To prevail on such a claim, Faulkner must establish that a defendant "by extreme and outrageous conduct, intentionally or recklessly caused [her to suffer] severe emotional distress."  <u>Morancy v. Morancy</u>, 134 N.H. 493, 496 (1991) (quoting <u>Restatement (Second) of Torts</u> § 46 (1965)).  Faulkner's burden of proof is a substantial one.

23

> In determining whether conduct is extreme and
> outrageous, it is not enough that a person has acted
> with an intent which is tortious or even criminal, or
> that he has intended to inflict emotional distress, or
> even that his conduct has been characterized by malice.
> Liability has been found only where the conduct has
> been so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of decency,
> and to be regarded as atrocious, and utterly
> intolerable in a civilized community.

Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 729 (2009)

(citations and internal punctuation omitted).

Here, Faulkner has not pointed to any conduct on the part of defendants that could possibly be construed as beyond the bounds of decency, atrocious, and utterly intolerable in a civilized society.  See generally, Tessier v. Rockefeller, 162 N.H. 324 (2011) (threats are insufficient to give rise to viable claim for intentional infliction of emotional distress); Mikell, 158 N.H. at 729-30 (false accusation by teacher against student that apparently motivated student's suicide, even when coupled with teacher's position of authority over student, did not give rise to viable claim for intentional infliction); Konefal v. Hollis/Brookline Co-op. Sch. Dist., 143 N.H. 256, 260 (1998) (even if discharge of employee was "illegal and reprehensible," a "great deal more is required to approach outrageous conduct. Such conduct is bad conduct, but it is not outrageous and intolerable conduct.") (citation omitted).

C.   Defamation / Slander

Finally, Faulkner asserts a common law claim for defamation and/or slander against Dr. Chertoff and Dr. Silas.  Faulkner claims those defendants had conversations with the directors of radiology programs to which she had applied, during which they made false statements about her that "placed [her] in a adverse light and reflected poorly on [her] as a prospective applicant." Second Amended Complaint, at para. 111.  To prevail on that claim, Faulkner must establish that one or both defendants "failed to exercise reasonable care in publishing a false and defamatory statement of fact about the plaintiff to a third party, unless a valid privilege applies to the communication." Thomas v. Telegraph Publ'g Co., 155 N.H. 314, 327 (2007).  It follows, then, that "a statement is not actionable if it is substantially true."  Simpkins v. Snow, 139 N.H. 735, 740 (1995).

Here, there is nothing in the record, beyond Faulkner's speculation, to support her claim that defendants made false and defamatory statements about her to the directors of other residency programs.  She identifies no actual statements giving rise to her claim, and so, points to no arguably false statements.  Defendants are, therefore, entitled to judgment as a matter of law on that claim.

## Conclusion

For the foregoing reasons, as well as those set forth in defendants' legal memorandum, defendants' motion for summary judgment (document no. 56) is granted. While likely meritorious, defendants' Rule 41 motion to dismiss (document no. 64) is denied as moot, given the entry of summary judgment.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

August 12, 2015

cc:  Christyna Faulkner, pro se
     Christopher J. Pyles, Esq.
     Edward M. Kaplan, Esq.